**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| RAYNARD GREEN, | |
| Appellant | No. 425 WDA 2018 |

Appeal from the Judgment of Sentence Entered March 4, 2018
In the Court of Common Pleas of Erie County
Criminal Division at No(s):
CP-25-CR-0000880-1978
CP-25-CR-0000881-1978

BEFORE:  BENDER, P.J.E., NICHOLS, J., and COLINS, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED JUNE 21, 2019**

Appellant, Raynard Green, appeals from the aggregate judgment of sentence of life imprisonment without the possibility of parole ("LWOP"), and a consecutive term of 15-30 years' incarceration.  After careful review, we affirm.

On the evening of April 25, 1978, 88-year-old Harriet Mikielski's body was discovered on the couch in her home.  A bloody blanket covered her face, her legs were spread apart, and her underwear had been removed.  She died from a massive blunt-force facial injury, which likely had been inflicted while

---

[*] Retired Senior Judge assigned to the Superior Court.

her face was covered with the blanket. Injuries to the inner walls of her labia indicated that a foreign object had been forcibly jammed into her vagina.

A few hours after Ms. Mikielski was murdered (and only a few blocks from her home), 57-year-old Ann Novel answered a knock at her door. It was Appellant, who put a knife to her throat, forced her to her bedroom, and proceeded to rape her for approximately 90 minutes. Appellant left Ms. Novel alive, although she suffered massive hemorrhaging that caused her to be hospitalized. Appellant also stole a few items from her home before leaving. Ms. Novel was ultimately able to identify Appellant from a lineup.

Appellant was 17 years old when these crimes were committed, but was tried as an adult. Later that year, Appellant was convicted by a jury of murdering Ms. Mikielski, and also of burglarizing her home (CP-25-CR-0000880-1978 ("Docket No. 880-1978") and CP-25-CR-0000881-1978 ("Docket No. 881-1978"), respectively). Soon thereafter, he pled guilty to raping Ms. Novel (CP-25-CR-0000883-1978 ("Docket No. 883-1978")). On April 10, 1979, the trial court sentenced Appellant to LWOP at Docket No. 880-1878, and to consecutive terms of 5-10 years' incarceration at Docket No. 881-1978, and 10-20 years' incarceration at Docket No. 883-1978. Appellant appealed directly to our Supreme Court, which affirmed his judgment of sentence on April 25, 1980. *Commonwealth v. Green*, 413 A.2d 651 (Pa. 1980).

Appellant filed numerous PCRA[1] petitions between 1980 and 2012, none of which were successful or relevant to this appeal. However, in 2016, the United States Supreme Court decided **Montgomery v. Louisiana**, 136 S. Ct. 718, 723 (2016), holding that its prior decision in **Miller v. Alabama**, 567 U.S. 460 (2012), applied retroactively. In **Miller**, the High Court had determined that the mandatory imposition of LWOP sentences on juveniles constitutes a violation of the 8th Amendment.

As Appellant falls squarely within the class of individuals addressed by **Miller** and **Montgomery**, he filed two PCRA petitions, on March 21, 2016, and March 23, 2016, seeking resentencing pursuant to those decisions. The PCRA court appointed counsel, who filed an amended PCRA petition on Appellant's behalf. The Commonwealth agreed that relief was due; subsequently, the PCRA court consolidated the two petitions, and granted Appellant's request for resentencing.

> On November 14, 2016, Appellant filed a Motion For the Appointment of a Mitigation Specialist, which included a request for funding for the same. Following a hearing, on December 9, 2016, the [c]ourt granted … Appellant's request for a mitigation specialist, and granted Appellant's motion for production of his juvenile record. The mitigation specialist was Randolph A. Matuscak, MSW, AFSW. On April 4, 2017, the [c]ourt granted Appellant's request for Matuscak to have access to Appellant's records, including juvenile records, [and] CYS records[.] [Ex.] 1 and 2 respectively were the CV and report of Matuscak. [Appellant]'s Sentencing Memorandum was admitted as Defendant's Ex. 3.

---

[1] Post Conviction Relief Act, 42 Pa.C.S. §§ 9541-9546.

> At the resentencing hearing, the Commonwealth presented testimony of the victim's grandchildren … and the victim's great-grandchildren….   Appellant presented the testimony of one witness, Loretta Green, [his] second cousin….
>
> At the conclusion of the hearing, the [c]ourt sentenced Appellant as follows: Docket No. 880-1978: Murder of the First Degree – [LWOP]; Docket No. 881-1978: Burglary – 5 to 10 years, consecutive to No. 880-1978.  At Docket No. 883-1978, for the rape of Ann Novel, the [c]ourt sentenced Appellant to 10 to 20 years of incarceration.[2]
>
> On March 15, 2018, Appellant filed a Motion to Reconsider/Modify Sentence *Nunc Pro Tunc* which the [c]ourt denied on March 21, 2018.  On March 23, 2018, Appellant filed a Notice of Appeal from the resentencing Order.[3]   On March 29, 2018, the [c]ourt directed Appellant to file a [Pa.R.A.P.] 1925(b) Statement of Matters Complained of on Appeal.

Sentencing Court Opinion, 8/30/18, at 3-4 (citations omitted).

On April 30, 2018, Appellant filed his Rule 1925(b) statement, and the sentencing court issued its Rule 1925(a) opinion on August 30, 2018.

> Appellant now presents the following questions for our review:
>
> A. Did the [sentencing] court fail to apply a presumption against the imposition of [LWOP]?
>
> B. Did the [sentencing] court fail to appropriately consider Appellant's potential for rehabilitation and [err] in concluding that Appellant was permanently incorrigible?

---

[2] Thus, Appellant received the exact same sentence that had been originally imposed in 1978.

[3] In **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018), our Supreme Court held, pursuant to Pa.R.A.P. 341, that the failure to file separate notice of appeals for separate dockets must result in quashal of the appeal.  However, because **Walker** only applies prospectively from the date it was issued, June 1, 2018, and because in this case Appellant filed his notice of before that date, quashal is not appropriate.

C. Did the Commonwealth fail to present sufficient, competent evidence to establish that Appellant was incapable of rehabilitation?

D. Did the [sentencing] court fail to articulate how Appellant is one of the rare and uncommon cases where a sentence of [LWOP] is justified?

E. Did the [sentencing] [c]ourt err in applying … *Miller* and/or [the] factors of [18 Pa.C.S. §] 1102.1(d) in determining that Appellant was permanently incorrigible and incapable of rehabilitation?

F. Did the [sentencing] court place excessive weight on the facts of the crime?

G. Did the [sentencing] court place excessive weight on the impact of the crimes upon the family?

H. Did the [sentencing] court commit legal error in finding that Appellant did not have diminished culpability at the time of the crimes?

I. Did the [sentencing] court commit legal error in finding that Appellant's actions were not reflective of transient immaturity?

J. Did the [sentencing] court err in finding that Appellant was capable of assisting counsel at trial?

K. Did the [sentencing] court err in failed to accurately weigh Appellant's exposure to abuse as a child?

L. Did the [sentencing] court fail to appropriately consider … Appellant's age at the time of the offense?

Appellant's Brief at 12-13.[4]

Challenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right. *Commonwealth v.*

---

[4] Appellant raises twelve claims in his brief, but only raised ten claims in his Rule 1925(b) statement. However, we decline to deem any of his claims waived, as some of the issues that appeared as multi-part claims in his Rule 1925(b) statement have been separated into their constituent parts in his brief and, therefore, do not constitute new or previously-unraised issues.

*Sierra*, 752 A.2d 910, 912 (Pa. Super. 2000). An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test:

> [W]e conduct a four-part analysis to determine: (1) whether [the] appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [720]; (3) whether [the] appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.[] § 9781(b).

*Commonwealth v. Evans*, 901 A.2d 528, 533 (Pa. Super. 2006), *appeal denied*, 589 Pa. 727, 909 A.2d 303 (2006) (internal citations omitted). Objections to the discretionary aspects of a sentence are generally waived if they are not raised at the sentencing hearing or in a motion to modify the sentence imposed. *Commonwealth v. Mann*, 820 A.2d 788, 794 (Pa. Super. 2003), *appeal denied*, 574 Pa. 759, 831 A.2d 599 (2003).

The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. *Commonwealth v. Paul*, 925 A.2d 825, 828 (Pa. Super. 2007). A substantial question exists "only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." *Sierra*, *supra* at 912-13.

As to what constitutes a substantial question, this Court does not accept bald assertions of sentencing errors. *Commonwealth v. Malovich*, 903 A.2d 1247, 1252 (Pa. Super. 2006). An appellant must articulate the reasons the sentencing court's actions violated the sentencing code. *Id.*

*Commonwealth v. Moury*, 992 A.2d 162, 170 (Pa. Super. 2010).

Instantly, Appellant filed a timely notice of appeal, preserved his sentencing claims in a timely post-sentence motion, and provided this Court with a Rule 2119(f) statement in his brief. Moreover, we conclude that Appellant raises multiple substantial questions for our review. ***See***

***Commonwealth v. Caldwell***, 117 A.3d 763, 770 (Pa. Super. 2015) ("This Court has … held that an excessive sentence claim—in conjunction with an assertion that the court failed to consider mitigating factors—raises a substantial question.") (cleaned up).

Thus, we turn to the merits of Appellant's sentencing claims. Generally,

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

***Commonwealth v. Hoch***, 936 A.2d 515, 517–18 (Pa. Super. 2007) (citation omitted). Furthermore,

> [t]he United States Supreme Court decisions that control in this matter unambiguously permit the imposition of [an LWOP] sentence upon a juvenile offender only if the crime committed is indicative of the offender's permanent incorrigibility; that the crime was not the result of the unfortunate yet transient immaturity endemic of all juveniles. Therefore, for a sentence of [LWOP] to be proportional as applied to a juvenile murderer, the sentencing court must first find, based on competent evidence, that the offender is entirely unable to change. It must find that there is no possibility that the offender could be rehabilitated at any point later in his life, no matter how much time he spends in prison and regardless of the amount of therapeutic interventions he receives, and that the crime committed reflects the juvenile's true and unchangeable personality and character. ***Montgomery***, 136 S.Ct. at 733 (stating that pursuant to ***Miller***, [LWOP] is only justified for "the rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible").
>
> Under ***Miller*** and ***Montgomery***, a sentencing court has no discretion to sentence a juvenile offender to [LWOP] unless it finds that the defendant is one of the rare and uncommon children

- 7 -

possessing the above-stated characteristics, permitting its imposition. A sentence of [LWOP] for a murder committed when the defendant was a juvenile is otherwise disproportionate and unconstitutional under the Eighth Amendment.

Thus, in the absence of the sentencing court reaching a conclusion, supported by competent evidence, that the defendant will forever be incorrigible, without any hope for rehabilitation, a [LWOP] sentence imposed on a juvenile is illegal, as it is beyond the court's power to impose. As stated by the **Montgomery** Court, "when a State enforces a proscription or penalty barred by the Constitution, the resulting conviction or sentence is, by definition, unlawful." **Montgomery**, 136 S.Ct. at 729–30. As such, we must review the sentencing court's legal conclusion that [a defendant] is eligible to receive a sentence of [LWOP] pursuant to a *de novo* standard and plenary scope of review. Because this legal conclusion is premised upon the presentation of testimony and the sentencing court's credibility determinations, it presents a mixed question of fact and law. In such circumstances, we defer to the findings of fact made by the sentencing court as long as they are supported by competent evidence, but give no deference to that court's legal conclusions.

**Commonwealth v. Batts**, 163 A.3d 410, 435–36 (Pa. 2017) (cleaned up).

Instantly, the sentencing court determined that Appellant is entirely unable to change and, therefore, that he is constitutionally eligible for LWOP pursuant to **Miller** and **Montgomery**. Thus, our review is confined to whether the court's factual findings in support of that legal conclusion are, in turn, substantiated by the record. After a thorough review of that record, the parties' briefs, the applicable law, and the Rule 1925(a) opinion of the Honorable Daniel J. Brabender, Jr., we are compelled[5] to conclude that the

_____

[5] We are troubled that the Commonwealth failed to offer its own expert testimony in this matter; however, our Supreme Court has indicated that such expert testimony is not required, even though it is strongly preferred. **See Batts**, 163 A.3d at 456 ("Given the presumption against [LWOP] and the

sentencing court did not abuse its discretion in imposing an LWOP sentence, and we do so based on the rationale set forth in that opinion.

Judgment of sentence ***affirmed***.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/21/2019

---

Commonwealth's burden beyond a reasonable doubt to rebut the presumption, it is difficult to conceive of a case where the Commonwealth would not proffer expert testimony and where the sentencer would not find expert testimony to be necessary."); ***but see id.*** ("Nonetheless, whether expert testimony is required to rebut the presumption against permanent incorrigibility beyond a reasonable doubt will be determined on a case-by-case basis by the sentencing court."). However, apart from that deficiency, we cannot conclude that the trial court abused its discretion under our incredibly deferential standard of review for discretionary-aspects-of-sentencing claims. Under *de novo* review, we might reach a different conclusion, based on the same evidence, regarding whether Appellant is the "rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible." ***Montgomery***, 136 S.Ct. at 733. Nonetheless, we recognize that reasonable jurists may differ in their assessment of the same facts and, thus, applying the abuse-of-discretion standard of review, we are compelled to affirm, as we cannot conclude that the sentencing court's decision was manifestly unreasonable or an otherwise clear misapplication of the law. ***See Hoch***, ***supra***.

COMMONWEALTH OF PENNSYLVANIA    IN THE COURT OF COMMON PLEAS
: OF ERIE COUNTY, PENNSYLVANIA
:
v. : CRIMINAL DIVISION
:
RAYNARD GREEN : NOS. 880 OF 1978; 881 OF 1978

## OPINION

This matter is before the Court on Appellant's 1925(b) Concise Statement of Matters

Complained of on Appeal. For the reasons set forth below, the judgment of sentence should be

affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellant, Raynard Green, appeals from the judgment of sentence imposed on March 2,

2018, pursuant to a re-sentencing proceeding mandated by *Montgomery v. Louisana*, 136 S. Ct.

718 (2016) and *Commonwealth v. Batts*, 163 A.3d 410 (Pa. 2017)*("Batts II")*. Following a jury

trial, Green was convicted on October 23, 1978 of Murder of the First Degree of 88 year-old

Harriet Mikielski at Erie County Docket No. 880-1978, and Burglary of the victim's residence at

Erie County Docket No. 881-1978.

The crimes against Harriet Mikielski are aptly summarized as follows:

> On April 25, 1978, at approximately 8:30 p.m., [Appellant] burglarized the home
> of 88-year old Harriet Mikielski who lived at 453 East 13th Street, in Erie,
> Pennsylvania. Harriet was home at the time. The [Appellant] brutally beat
> Harriet to death by smashing her face in with a piece of exercise equipment. He
> then left Harriet on the couch, with a bloody comforter covering her face, her legs
> spread apart with underwear removed, and her stockings down to her ankles.

*See Commonwealth's Sentencing Memorandum filed February 28, 2018 (Commw. Sent.*

*Memorandum), p. 1.* The Coroner's Inquisition Report further explains the crimes against

Mikielski:

1

"All of the rooms on the first floor of the residence had been ransacked and the contents of drawers and cabinets were strewn about the floor. ... Some scratches and lacerations were detected on the inner walls of her libia (sic) indicating that some sort of instrument had been forcibly jammed into her genital canal. ... Measurements taken ... disclosed that her facial injuries were 11 centimeters in length and were inflicted when her face was covered, probably by the afghan on the couch."

*See Inquisition Report in the matter of Harriet Mikielski, Erie County Coroner Merle E. Wood, April 25, 1978.*

The crimes against Harriet Mikielski were solely committed by Appellant, just hours before he viciously attacked and raped another woman, Ann Novell, on the same date.[1] As further described by the Commonwealth:

When he completed [the crimes against Mikielski, Appellant] then went to 436 East 15th Street, Erie, Pennsylvania, the home of 57 year old Ann Novel. Ms. Novel answered a knock at her door, where [Appellant] confronted her with a knife, putting it to her throat and forcing her into the bedroom. There, he ordered her to remove her clothes and lay on the bed. [Appellant] then spent the next 90 minutes raping Ms. Novel, to the point where she began hemorrhaging profusely and had to be admitted to the hospital. [Appellant] washed himself off and left Ms. Novel's home with $2.00, some food stamps, and a watch.

*See Commw. Sent. Memorandum, p. 1. See also, Transcript of Proceedings, Re-Sentencing Hearing held March 2, 2018 (Tr.), pp. 4-5.*

Appellant committed the brutal and heinous crimes with sexual components less than eight months before Appellant's 18th birthday.[2]

On April 10, 1979, Appellant was sentenced as follows:

Docket No. 880-1978: Murder of the First Degree (Harriet Mikielski) - life without parole.

---

[1] On November 14, 1978, Appellant pled guilty to the rape of Ann Novel at Erie County Docket No. 883-1978.
[2] Appellant's date of birth is December 21, 1960. Appellant was 17 years, four months and four days old when the offenses were committed.

2

Docket No. 881-1978: Burglary (Harriet Mikielski) - 5 to 10 years, consecutive to No. 880-1978

Docket No. 883-1978: Rape (Ann Novel) – 10 to 20 years, consecutive to No. 881-1978.

*Tr. pp. 3-4.*

The Superior Court affirmed the judgments of sentence at this docket on April 25, 1980.

Numerous post-conviction proceedings were instituted. Relief was denied in each instance until the most recent PCRAs of March, 2016.[3] On March 21, 2016 and March 23, 2016, Appellant filed nearly identical *pro se* PCRA petitions. Counsel was appointed who filed an amended PCRA. The PCRAs of March, 2016 were timely based upon 42 Pa.C.S.A. §9545(b) and *Commonwealth v. Secreti*, 134 A.3d 77 (Pa. Super. 2016). The Commonwealth filed a response agreeing PCRA relief was due. On August 2, 2016, the Court consolidated the PCRAs and treated them as one filed on March 21, 2016. The Court granted PCRA relief in the nature of re-sentencing pursuant to *Montgomery v. Louisiana*, ___ U.S. ___, 136 S. Ct. 718 (2016), and directed resentencing was to be deferred until after issuance of the decision in *Commonwealth v. Batts*, 163 A.3d 410 (Pa. 2017)(*"Batts II"*).

On November 14, 2016, Appellant filed a Motion For the Appointment of a Mitigation Specialist, which included a request for funding for the same. Following a hearing, on December 9, 2016, the Court granted the Appellant's request for a mitigation specialist, and granted Appellant's motion for production of his juvenile record. The mitigation specialist was Randolph A. Matuscak, MSW, AFSW. On April 4, 2017, the Court granted Appellant's request for Matusak to have access to Appellant's records, including juvenile records, CYS records,

---

[3] On November 10, 1980, the first proceeding under the former statute, the PCHA, was filed. The trial court denied relief and in June of 1983 the Superior Court affirmed the trial court's Order denying PCHA relief. The second post conviction proceeding was filed in April, 1998 and relief was denied by the trial court the same month. The third post-conviction proceeding was commenced in July, 2010 and denied in August, 2010. On July 25, 2012, Appellant filed a fourth petition for post-conviction relief. On June 24, 2014, the Superior Court affirmed the trial court's order denying PCRA relief.

3

1 and 2 respectively were the CV and report of Matuscak. Defendant's Sentencing Memorandum was admitted as Defendant's Ex. 3. *Tr., pp. 30-31.*

At the resentencing hearing, the Commonwealth presented testimony of the victim's grandchildren: John Skladanowski, *Tr. pp. 13-16*; Terry Ort, *Tr., pp. 16-17*; Maryann Hannah, *Tr., pp. 18-24*; and Daria Marnella, *Tr. pp. 27-30*; and the victim's great-grandchildren, Dana and Laura Skladanowski, *Tr., pp. 25-26.* Appellant presented the testimony of one witness, Loretta Green, a second cousin of Appellant. *Tr. pp. 32-36.*

At the conclusion of the hearing, the Court sentenced Appellant as follows: Docket No. 880-1978: Murder of the First Degree - life without parole; Docket No. 881-1978: Burglary - 5 to 10 years, consecutive to No. 880-1978. *Tr. pp. 76-77.* At Docket No. 883-1978, for the rape of Ann Novel, the Court sentenced Appellant to 10 to 20 years of incarceration. *Tr., pp. 77.*

On March 15, 2018, Appellant filed a Motion to Reconsider/Modify Sentence *Nunc Pro Tunc* which the Court denied on March 21, 2018. On March 23, 2018, Appellant filed a Notice of Appeal from the resentencing Order. On March 29, 2018, the Court directed Appellant to file a Rule 1925(b) Statement of Matters Complained of on Appeal. On April 30, 2018, Appellant filed a Statement of Errors Complained of on Appeal.

Distilled and rephrased for clarity, Appellant raises the following claims for appellate review:

1. Whether error occurred in failing to apply a presumption against the imposition of life without parole *(1925(b) Statement, ¶1)*;

2. Whether Appellant's potential for rehabilitation was appropriately considered *(1925(b) Statement, ¶2)*;

    a. Whether the Court appropriately considered psychological reports from the 1970's *(1925(b) Statement, ¶3)*;

    b. Whether there was competent evidence to conclude Appellant was

5

incapable of rehabilitation *(1925(b) Statement, ¶4);*

c. Whether it was error to ultimately conclude Appellant was permanently incorrigible and incapable of rehabilitation *(1925(b) Statement, ¶5);*

3. Whether the Court failed to articulate how Appellant is one of the rare and uncommon cases where a sentence of life without parole is justified *(1925(b) Statement, ¶7);*

4. Whether error occurred in the application of certain *Miller* factors and/or factors at 18 Pa. C.S.A. §1102.1(d) in determining Appellant was permanently incorrigible and incapable of rehabilitation:

a. Whether the Court placed excessive weight on the facts of the crime *(See 1925(b) Statement, ¶6);*

b. Whether the Court placed excessive weight on the impact of the crimes upon the family *(See 1925(b) Statement, ¶6);*

c. Whether legal error occurred in finding Appellant did not have diminished culpability at the time of the crimes *(See 1925(b) Statement, ¶8);*

d. Whether legal error occurred in finding Appellant's actions were not reflective of transient immaturity *(See 1925(b) Statement, ¶8);*

e. Whether legal error occurred in finding Appellant was capable of assisting counsel at trial *(See 1925(b) Statement, ¶8);*

f. Whether the Court adequately weighed Appellant's exposure to abuse as a child *(See 1925(b) Statement, ¶9);* and

g. Whether the Appellant's age at the time of the offense was appropriately considered *(See 1925(b) Statement, ¶10).*

## APPLICABLE LEGAL PRINCIPLES

As stated by the Pennsylvania Supreme Court in *Commonwealth v. Batts ("Batts II"),* 163 A.3d 410 (Pa. 2017):

For sentencing purposes, there is a presumption against the imposition of a sentence of life without parole for a defendant convicted of first-degree murder committed as a juvenile. ... To rebut the presumption, the Commonwealth has the burden to prove, beyond a reasonable doubt, that the juvenile offender is permanently incorrigible and thus is unable to be rehabilitated. Consistent with the mandate of *Miller* and *Montgomery,* for a life-without-parole sentence to be

6

constitutionally valid, the sentencing court must find that the juvenile offender is permanently incorrigible and that rehabilitation would be impossible. The Commonwealth's evidence and the sentencing court's decision must take into account the factors announced in *Miller* and section 1102.1(d) of the Crimes Code.

*Commonwealth v. Batts ("Batts II")*, 163 A.3d at 483-484.

If, after a hearing and consideration of all of the evidence presented, the sentencing court finds that the Commonwealth has satisfied its burden of proving beyond a reasonable doubt that the juvenile is so permanently incorrigible that rehabilitation of the offender would be impossible, the bar against sentencing a juvenile offender to life without the possibility of parole is lifted. Despite the certainty of its conclusion that the offender can never be rehabilitated, however, it is left to the sentencing court's discretion whether to impose a life-without-parole sentence ... or to instead impose a sentence that would allow the juvenile to have an opportunity for parole consideration.

*Commonwealth v. Batts ("Batts II")*, 163 A.3d at 480.

As summarized by the Superior Court in *Commonwealth v. Knox*, 50 A.3d 732, 745 (Pa. Super. 2012), and the Pennsylvania Supreme Court in *Batts I*, 66 A.3d 286, 297 (Pa. 2013), the *Miller* factors are:

    a. juvenile's age at the time of the offense;

    b. his diminished culpability;

    c. capacity for change;

    d. the circumstances of the crime;

    e. the extent of his participation in the crime;

    f. his family, home and neighborhood environment;

    g. his emotional maturity and development

    h. the extent that familial and/or peer pressure may have affected him;

    i. his past exposure to violence;

    j. his drug and alcohol history;

    k. his ability to deal with the police;

    l. his capacity to assist his attorney;

7

m.  his mental health history, and

n.  his potential for rehabilitation.

*Knox*, 50 A.3d at 745; *Batts I*, 66 A.3d at 297.

The factors the Court must consider per 18 Pa.C.S.A. §1102.1(d) are:

(1) The impact of the offense on each victim, including oral and written victim impact statements made or submitted by family members of the victim detailing the physical, psychological and economic effects of the crime on the victim and the victim's family. A victim impact statement may include comment on the sentence of the defendant.

(2) The impact of the offense on the community.

(3) The threat to the safety of the public or any individual posed by the defendant.

(4) The nature and circumstances of the offense committed by the defendant.

(5) The degree of the defendant's culpability.

(6) Guidelines for sentencing and resentencing adopted by the Pennsylvania Commission on Sentencing.

(7) Age-related characteristics of the defendant, including:
 (i) Age.
 (ii) Mental capacity.
 (iii) Maturity.
 (iv) The degree of criminal sophistication exhibited by the defendant.
 (v) The nature and extent of any prior delinquent or criminal history, including the success or failure of any previous attempts by the court to rehabilitate the defendant.
 (vi) Probation or institutional reports.
 (vii) Other relevant factors.

*18 Pa.C.S. § 1102.1(d)*.

In Batts II, our Supreme Court reaffirmed its holding in *Batts I* that:

For those defendants [convicted of first or second-degree murder prior to June 25, 2012] for whom the sentencing court determines a [LWOP] sentence is inappropriate, it is our determination here that they are subject to a **mandatory maximum sentence of life imprisonment** as required by section 1102(a), **accompanied by a minimum sentence determined by the common pleas court upon resentencing**[.]

*Commonwealth v. Seskey, 170 A.3d 1105, 1108-1109 (Pa. Super. 2017), citing*

*Batts II*, 163 A.3d at 421 (internal alteration and quotation marks omitted; emphasis added). In

8

other words, our Supreme Court merely severed "the prohibition against paroling an individual sentenced to serve life in prison in section 6137(a)(1) as applied to these offenders." *Id.*

## DISCUSSION

This Court's reasoning for imposing sentence is set forth in the sentencing transcript. *See Transcript of Proceedings, Re-Sentencing Hearing held March 2, 2018 (Tr.), pp. 53-78.* The Court recited the procedural background of the case. *Tr. pp. 53-56.* The Court acknowledged that pursuant to *Commonwealth v. Batts* and its progeny, there is a presumption against sentencing a juvenile offender to life in prison without the possibility of parole and the burden was upon the Commonwealth to prove the juvenile was constitutionally eligible to receive the sentence beyond a reasonable doubt. *Tr. pp. 56-57, 74-76.*

With regard to this Court's reasons for the sentences, at sentencing the Court stated:

THE COURT: Now, I'm taking into consideration the record, which I examined closely, from 1978 to the present. I'm also taking into account the statements of both counsel this morning. I'm also taking into account the fact the defendant did not give a statement which he has the absolute right to remain silent and he chose to exercise that right. I'm also taking into account several witnesses that testified, including John Skladanowski, grandson of the victim; Terry Ort, granddaughter of the victim; Maryann Hannah, granddaughter of the victim; Dave Skladanowski, great-grandson, I think, right? Yes?

MR. DANERI: Granddaughters; Laura and Dana.

THE COURT: Laura and Dana are the great-granddaughters. David is the great grandson? David -- I wrote --

MR. DANERI: Daria Marnella.

THE COURT: No, I have Daria Marnella, granddaughter; also Loretta Green, the cousin of the defendant from Farrell, Pennsylvania. I'm also taking into account sentencing memorandums well prepared by both counsel in this case.

I'm also taking into account all the exhibits that have been presented, including photographs of the crime scene as well as -- I didn't count them, but I read every

9

single one of them, I'd say 50 letters, maybe, at least, on behalf of Harriet Mikielski.

I'm also taking into account documents, including a psychological evaluation that was done on Raynard Green when he was 14 years old. This was done in 1975 and it's a pretty detailed report, which tells us that he at that time was of borderline intelligence, he had denial and dismissal type problems, that he was not amenable to any psychotherapy or treatment program at that time. And that he had no real insight into his own problems and also that he claimed to hear things.

I'm also taking into account a memorandum that was submitted to Mercer County Court of Common Pleas, Judge Albert Acker, and that was from a probation Officer, Louis Taylor, prepared in 1975, which told us in Mr. Green's situation that the theme running throughout the psychological testing was that "Raynard is fixated on the older women as a sex object." And another probation officer -- or no, I'm sorry, the person that prepared the psychological report described Raynard as being a DeSalvo type. And for us older people in the courtroom, you know, that would refer to the Boston Strangler who killed and sexually abused so many elderly woman in the Boston area. I mean, ·I look at this, there were some warning signs. They state that Raynard was -- now, this is when he was, I think, 15 years old. "One of the most potentially dangerous individuals to come through the juvenile court;" that was in Mercer County. " And the stakes involved with this disposition were really quite high, considering the threat that may exist to older women from Raynard's sexual deviancy." Also, "Raynard sees himself as totally worthless, useless, and rejected, and he has trouble controlling his anger. These things together can make him a dangerous individual." And that was three years before the murder of Harriet Mikielski.

*Tr. pp. 57-59.*

The Court also engaged in an on-the-record review of Appellant's prior delinquent and criminal history, including the success or failure of previous attempts at rehabilitation, and a review of probation and institutional reports about Appellant. *Tr. pp. 59-65.* This included a review of a psychological evaluation of Appellant when he was 14 years old, and reports of psychological evaluations conducted after the murder of Mikielski. *Tr. pp. 59-61.* The Court further reviewed the childhood, juvenile and delinquent history of Appellant as related in the report of Appellant's mitigation expert, Randolph A. Matuscak, which report was admitted in the record at re-sentencing as a Defense exhibit. *Tr. pp. 6-7, 9, 61-66.*

10

The Court also reviewed historical information about Appellant from the time of the subject murder and robbery through the present, stating as follows:

> **THE COURT:** Now, since his time in prison, the initial reports say from 1979 when he was tested for classification at Western Penitentiary, Mr. Green made a statement that he was not sure that he even committed these crimes. And the counselor noted that Mr. Green is so immature at this time that he cannot plan any personal goals and will probably develop a rather hostile attitude for a number of years. That classification was transferred to SCI Camp Hill and later, in 1993, Mr. Green was transferred to SCI Albion where he continues to reside to this day.
>
> Now, during his time in prison, there were -- he was written up for a number of misconduct reports. But I will say that most of them I have to consider as relatively minor. I mean, there were -- I counted 27 times that he was written up, but it was things like refusal to work, refusal to obey an order, disruption. I didn't see anything that would have warranted more criminal charges, except maybe one time there was a theft of cable services. But there were things like abusive language to employees of the prison, things of that nature. That was all at Camp Hill from 1979 to 1992; 27 times he was written up.
>
> Now, his adjustment in Albion from 1993 until 2012: He went to Albion at age 33, there were 6 times that he was written up, once again refusing to obey orders, but also threatening another person, telling somebody that he was so angry at his cellmate that he wanted to do physical harm to him. And he also possessed contraband in prison, which I think was a betting slip, not drugs.
>
> All right. What I find of particular importance, while he has a diagnosis of depressive disorder and chronic pain disorder in prison, that Mr. Green has had difficulty dealing with his life sentence. And they said in 2006 was the first time he ever wept over discussing the earlier deaths of his sister, as well as his mother, not Harriet.
>
> *And as the years passed, he did not take advantage of the prison program, which is simply participation in education classes, here they call it the ISOP program, Integrated Sexual Offense Program.* And he refused to engage in this treatment because of his state at that time that he realized that he would never leave the prison confines.
>
> Other than that, his adjustment was good in prison. *But he has not, as both counsel has stated, completed this sexual offender program.* He has above-average work habits, appears to be a good worker.
>
> Another disturbing matter was when there was 67 pages of pornography hidden in his property in prison. I'm not sure what the pornography exactly was, the report simply states pornography. There was also -- he was found guilty on charges of

11

sexual harassment and using abusive, obscene, or inappropriate language to an employee. And he was placed in solitary confinement for thirty days because of that.

*Now, for whatever reason, they said he has said that he's not comfortable taking the sexual offender program classes and the reason he gave was because he did not commit the crimes and he did not rape anybody. That was his statement. And that was as recent as 2006, a dozen years ago. So he has had extreme difficulty and an unwillingness to deal with this sexual abuse problem he has concerning older women or I suppose any women. He just has not addressed these issues.*

*Tr. pp. 66-69* (emphasis added).

The Court considered the circumstances of the crime, stating as follows:

**THE COURT:** And going back to the incidents in question, as stated, and I don't like repeating it, but I think the record has to be complete, but police observed Mrs. Mikielski's nose and eyes area had been beaten to the point that her nose was flush with her cheek area and her face was covered with matted blood, and some instrument was used to strike her in the head during the attack, and the lower portion of her body was naked from the waist down, and there was some type of sexual molestation with some instrument and lacerations in her vaginal area.

And also, on the same evening occurred the rape of Ms. Novel. A woman heard a knock on her door and believing it to be her son, opened the door and was confronted by Mr. Green who forcibly raped her and caused significant vaginal bleeding.

*Tr. pp. 69-70.*

The Court further considered these and the additional required *Miller* factors and factors at 18 Pa.C.S.A. §1102.1(d), including the impact on the victims; potential for rehabilitation; age at time of offenses; whether Appellant had any diminished mental capacity; the extent of Appellant's participation in the crime; Appellant's emotional maturity and development; the extent familial and/or peer pressure may have affected Appellant; Appellant's past exposure to violence and his drug and alcohol history; his capacity to assist his attorney; his mental health history; his potential for rehabilitation; the impact of the offense upon the community; the threat to the safety of the public or any

12

individual posed by Appellant; the degree of Appellant's culpability; the sentencing guidelines, the Presentence Investigation Report; and age-related characteristics of Appellant. *Tr. pp. 70-74.*

In so doing, the Court stated at re-sentencing:

**THE COURT:** Now, Scott Steigmeyer has been mentioned and he's not here. And you know, I can't imagine what this fella has gone through. Particularly, when the calls were first made to the police, he was considered a suspect. Now, what a horrible thing that that had to be, going through his mind, when he was not in any way, shape, or form -- he's the one that had to find Harriet Mikielski in the state that she was in. Now, that position didn't last long, of course, after discussing the matter quickly with Mr. Steigmeyer, but, you know, it's bothersome to me.[5]

Okay. Well, I think you get the picture, but, you know, maybe Mr. Green could have been a different person had he had a different upbringing, whatever the arguments may be. But we have to deal with the facts. The facts are a difficult thing and we have to deal with him as he is, as a person.

Now, to meet the burden of proof that the Commonwealth must meet, they must establish that the defendant exhibit such irretrievable depravity that rehabilitation is impossible. Okay. Now, to meet this burden, they must present evidence, and I've gone through a portion of it, relating to certain factors that I will discuss, including the Commonwealth versus Knox and Miller cases.

I have to consider the juvenile's age at the time of the offense; he was very close to being an adult. His diminished culpability; which I see none. It's not like he was, say, just driving a getaway car or something and waiting for somebody else to come out, he was wholly one hundred percent culpable here. His capacity for change; I see no evidence of that at this time. And the circumstances of his crime as I just relayed to you were horrific.

I have to consider the extent of his participation in the crime; one hundred percent. His family home and neighborhood environment; which was horrific as well. His emotional maturity and development; I have really seen nothing to show that it's improved all these years. The extent that familial and peer pressure may have affected him; what he did was sought out a couple of younger boys in the neighborhood, it wasn't like somebody said hey, come on, Raynard, why don't you go in and do this and that. He did this on his own. His past exposure to violence; I have told you about that. His drug and alcohol history; which is also very significant. His capacity to assist his attorney; he is not considered so

---

[5] Scott Steigmeyer was the relative of the murder victim who found the victim lying on the couch, unrecognizable, after the murder. *Tr. p. 14.*

mentally deficient that he could not assist his counsel in this matter. His mental health history; he has had plenty of opportunities for treatment over the years. And his potential for rehabilitation; I guess you can always say there's potential, but I haven't seen any progress in any regard.

Now, a lot of this has been codified by the legislature and there are statutory factors, even direct laws that I must follow. And one is the impact of the offense on each victim. And it's not just, in my opinion, on Mrs. Mikielski, but it's also on all you people out there and the people that aren't here that wrote to me, and I believe her own children are deceased now, but the grandchildren, great-grandchildren, friends who lost their Busia, who was, by all accounts, a wonderful person.

The impact of this offense on the community; very significant. I had just got back to Erie and I remember the impact on this community after this murder.

I have to consider the threat to the safety of the public; that threat is still out there if Mr. Green would be released. The nature and circumstances of the offense; probably in my years as a judge, these are -- this may be, may be the worst factual situation I have heard to this point. I'm not going to say I've heard it all because almost every day in this courtroom I say you can never say you've heard it all. But I would say up to this point, it's about the worst.

The degree of the defendant's culpability; the guidelines for sentencing, which I am taking into account as promulgated by the Pennsylvania Commission on Sentencing.

I'm also taking into account the Presentence Investigation Report as done by Probation Officer James Bowers, which also includes the presentence report that was presented to Judge McClelland in 1978.

And I'm also to take into account the age-related characteristics of the defendant, including his age and mental capacity, his maturity, the degree of criminal sophistication exhibited by the defendant, which I think at the time of these crimes was significant, and the nature and extent of any prior or criminal history, and the success or failure of attempts to rehabilitate him, which did not occur at all, no matter how many times he had to appear in court, no matter how many probation officers or psychiatrists or psychologists he saw.

*Tr. pp. 70-74.*

The Court concluded Appellant was permanently incorrigible and incapable of rehabilitation, and the Commonwealth met its burden of proof in establishing the constitutionality of a life without parole sentence for Appellant. The Court stated:

14

**THE COURT:** Now, this is a sentencing. It's a traditional sentencing. I sentenced people this morning, I can't even remember, maybe a DUI or something, I can't remember, but it's simply a traditional sentencing.

And, you know, I believe that the Commonwealth has satisfied its burden. And although I'm not required to impose a life without parole sentence, I don't have to do that, but in looking at this case, you know, just the fact that -- I mean, engaging in numerous crimes after this murder, I just -- you know, I have to use my discretion in looking at this case in its entire sphere.

And I believe, unfortunately, that this offender is entirely unable to change. I don't believe that there is any possibility, especially when he did not take the opportunities given to him, that he could be rehabilitated at any point in his life. And how long has it been now? Forty years he's been in, and he hasn't been able to change or be rehabilitated. And I believe that this defendant will forever be incorrigible or delinquent, that's what they say in juvenile court. And I just don't believe that there is any hope for rehabilitation.

And, you know, there's -- it's been stated that there's been no record of violence since he's been in prison for forty years, and that may be true, but we don't have a situation in prison like we have out on the streets the night Harriet Mikielski was murdered. There is no older females in prison for him to assault. I mean, there may be -- there certainly is females that work at the prison, but they are not in the general population. So really, as Mr. Daneri said, we'd never know. We don't have that crystal ball.

This was an intentional murder, and although, as stated by Attorney Hackwelder, it's true, I just can't consider the circumstances of the murder. I have to look at what's happened since that time.

I just want to make sure I covered everything here.

In this instant post-conviction proceeding, okay, I must express that I feel that the burden of proof was met by the Commonwealth, even though there was no expert testimony in this regard. Expert testimony actually is not required to rebut the presumption against imposition of a life sentence without the possibility of parole; it's not required. Now, the necessity of that, of the need for expert testimony, that's within my discretion. I'd have to agree with Mr. Daneri that it was not needed in this case based on all the information that I have, and I believe it's complete for what I need to sentence Mr.Green on.

Now, expert testimony is admissible, of course, if the information is outside the common knowledge of the fact finder, which is me. And the testimony of an expert will aid me in understanding the facts here, using generally accepted methodologies. But I believe with all these reports I have from everybody else, there's nothing more really that an expert can add.

15

Now, I don't know, this is a new thing, this is the first time I've had a case of this sort, and I can picture cases where there may be a need to proffer expert testimony. However, it's not required to rebut the presumption against permanent incorrigibility beyond a reasonable doubt, and I believe that that's what we have found here.

...

You know, we never -- the courtroom, I've come to find, we try to reach a measure of justice. I'm not saying we always get there, in fact, probably rarely do we really get there. We have the opportunity to get the justice here. In a case like this, we're never going to have justice.

Mr. Green actually is doing well in prison, so that's where he should be. We know outside of prison he does not do well. And I have seen nothing that would tell me that that would change. Prison is the best place for him. It's better for him to be in prison than to be out on the streets. Unfortunately, the family, friends, of this woman, who miss their Busia dearly, still have to live with this. And that's the unfortunate part of all of this.

Is there anything that needs to be brought to the Court's attention?

**MR. DANERI:** No, Your Honor.

**THE COURT:** Do the findings of fact need to be altered in any fashion?

**MR. DANERI:** No request from the Commonwealth, Your Honor.

**THE COURT:** Defense?

**MR. HACKWELDER:** No, Your Honor.

**THE COURT:** All right. We are in recess.

*Tr. pp. 74-78.*

Appellant's claim error occurred in failing to apply a presumption against the imposition of life without parole *(1925(b) Statement, ¶1)* is meritless. The sentencing record reflects there was no error in this regard. The sentencing court recognized the presumption, appropriately considered the evidence, and correctly applied the presumption in imposing sentence. *Sentencing Tr.*

16

Appellant's generic claim the potential for rehabilitation was inappropriately considered (1925(b) Statement, ¶2) is factually incorrect. In support of the claim, Appellant asserted the Court appropriately considered psychological reports from the 1970's *(1925(b) Statement, ¶3)*. This claim of evidentiary error is baseless. Review of prior delinquency or criminal history, including the results of previous attempts by the court to rehabilitate the defendant is mandated per 18 Pa.C.S.A. §1102.1(d)(7)(v). The review of probation or institutional reports and other relevant factors is also mandated by 18 Pa.C.S.A. §1102.1(d)(7)(vi-vii). *18 Pa.C.S.A. §1102.1(d)*. The reports were relevant and appropriately considered by the Court. The claim is baseless.

In further support of the claim, Appellant asserts there was no competent evidence to conclude Appellant was incapable of rehabilitation *(1925(b) Statement ¶4)*. The record belies this claim as well. There was sufficient, competent evidence to support the Court's conclusion Appellant was incapable of rehabilitation. The record establishes the Court engaged in a thorough analysis of Appellant's rehabilitation potential, or lack thereof. Extremely telling to the Court was Appellant's background as related by Appellant's expert mitigation specialist, Randolph A. Matuscak. This background included Appellant's refusal, to the date of re-sentencing, to engage in sexual offender counseling with regard to the heinous murder of Harriet Mikielski which had gruesome sexual components. Appellant's refusal to participate in such counseling, even as he awaited re-sentencing, demonstrated inability and unwillingness to be rehabilitated. The evidence of record was competent to support the Court's conclusion Appellant was incapable of rehabilitation. Similarly, no error occurred in ultimately concluding Appellant was permanently incorrigible and incapable of rehabilitation *(1925(b) Statement, ¶5)*. These claims must be dismissed.

17

Appellant's claim the Court failed to articulate how Appellant is one of the rare and uncommon cases where a sentence of life without parole is justified *(1925(b) Statement, ¶7)* is baseless. Over twenty pages of the re-sentencing transcript are devoted to the Court's findings and analysis which led to the ultimate conclusion a life without parole sentence under the facts was justified. The Court aptly articulated the bases for its conclusions and sentence. The claim lacks factual basis and must be dismissed.

Appellant's claims error occurred in applying certain *Miller* factors and/or factors at 18 Pa. C.S.A. §1102.1(d) in determining Appellant was permanently incorrigible and incapable of rehabilitation are wholly without merit and must be dismissed.

Appellant's claim the Court placed excessive weight on the facts of the crime *(See 1925(b) Statement, ¶6)* is not supported by the record. The Court appropriately weighed the facts of the crime. Appellant's claim the Court placed excessive weight on the impact of the crimes upon the family *(See 1925(b) Statement, ¶6)* is not supported by the record. The Court appropriately weighed this factor. Appellant's claim legal error occurred in finding Appellant did not have diminished culpability at the time of the crimes *(See 1925(b) Statement, ¶8)* is likewise not supported by the record. The record demonstrates the Court appropriately considered Appellant's upbringing and childhood and appropriately weighed any potentially mitigating factors under the facts and circumstances of the crimes. As the Court identified, Appellant was nearly eighteen years old at the time and was 100% responsible for the crimes which did not involve coercive factors or the impetus of youth. No legal error occurred in this regard. These claims must be dismissed. Similarly, no legal error occurred in finding Appellant's actions were not reflective of transient immaturity *(See 1925(b) Statement, ¶8)*. No evidence to the contrary was identified. Further, the record established Appellant demonstrated

18

steadfastness and consistency through time of re-sentencing in continued refusal and failure to rehabilitate, in refusing to engage in sexual offender treatment or programs. The claim is baseless and must be dismissed.

No error occurred in finding Appellant was capable of assisting counsel at trial *(See 1925(b) Statement, ¶8)*. The Court adequately weighed Appellant's exposure to abuse as a child *(See 1925(b) Statement, ¶9)*. The record demonstrates Appellant's age at the time of the offense was appropriately considered *(See 1925(b) Statement, ¶10)*. These claims must likewise fail.

## CONCLUSION

For the above reasons, the judgment of sentence should be affirmed. The Clerk of Courts is hereby directed to transmit the record to the Superior Court.

BY THE COURT:

8/30/2018
Date

Daniel J. Brabender, Jr., Judge

cc:     District Attorney's Office
        Eric V. Hackwelder, Esq., 2503 West 26th Street, Erie, PA 16506

19